**SCOTTISH UNION & NATIONAL INS. CO. v. BENOWITZ et al.**

Civil Action No. 699.

District Court, D. Connecticut.

Aug. 26, 1943.

Maxwell H. Goldstein, of New Haven, Conn., and Isidor E. Finkelstein, of Hartford, Conn., for plaintiff.

William H. Kingston, of Ansonia, Conn., and William Hennessy, of Waterbury, Conn., for defendants Henry Benowitz and H. Benowitz, Inc.

Martin E. Gormley, of New Haven, Conn., for defendants Louis J. Kasden and Harry E. Kasden, d.b.a. Kasden Fuel Co.

HINCKS, District Judge.

Finding of Facts.

1. The plaintiff, the Scottish Union and National Insurance Company, is an English insurance company organized and existing under an act of Parliament of Great Britain and Ireland and licensed to do business in Connecticut.

2. Said Scottish Union and National Insurance Company issued an Inland Marine Garment Contractors Floater Policy to the

Ballad Dress Company, Incorporated, of New York, covering its merchandise while in the hands or on the premises of others, against, among other risks, fire and smoke damage. Some few days prior to January 21, 1941, said Ballad Dress Company sent its goods and trimmings of the value of $5,774.86 to the Derby Sportwear Company of Shelton, Connecticut, a manufacturer of women's wear, to be made up into dresses and shipped back to New York. In the evening of January 21, 1941, a fire occurred in the basement of the Clark Building in Ansonia, a building of which said Derby Sportwear Company as tenant occupies an upper floor, and as a result of said fire said dresses were damaged to the extent of $3,935.86.

3. The plaintiff paid said loss to the Ballad Company which thereupon, by express written assignment, assigned all its rights, powers and privileges to the plaintiff to pursue its right of subrogation and recoupment for the loss incurred, against anyone liable for the damage caused.

4. The Clark Building is owned by the defendant H. G. Benowitz, Inc., which is a family corporation in which the defendant, Henry Benowitz, is the principal stockholder. Henry Benowitz is an officer of the corporation, and on January 21, 1941, and long prior thereto acted as manager of the property and was the only officer or employee active in the details of management and maintenance.

5. For several years prior to January 21, 1941, the entire building was heated by a central heating system serving the several tenants in the building, which comprised a steam boiler fueled by oil located in the basement of the building, operated and solely controlled by the defendant H. G. Benowitz, Inc., through its agent, the defendant Henry Benowitz.

6. On December 27, 1939, pursuant to a contract between H. G. Benowitz, Inc., and the defendant, Kasden Fuel Company, a Williams oil burner was installed in substitution for the burner which theretofore had comprised an integral part of the system.

7. From December 27, 1939, and thereafter to the present time said Williams burner has been an integral part of the heating system of said building. The system included a 550-gallon tank located on the basement floor under the sidewalk in front of the building. This tank was filled by a feed-pipe extending upward from the tank to a manhole on the sidewalk. To permit measurement of the contents of the tank a T-fitting was screwed into the top of the tank. This fitting was designed to accommodate a gauge, screwed into the top thereof, operable by a float in the tank; the float within the tank being connected with the gauge above the tank through an aperture $\frac{1}{4}$" in diameter in the top of the fitting. But on January 21, 1941, and for long prior thereto the tank had been without the gauge for which it was designed and the aperture just referred to had been left wholly uncovered. Without the gauge to measure the contents of the tank it was necessary to unscrew the fitting and insert a measuring stick. The floor of the basement, which was of cement, sloped downward from the tank to the burner and boiler located about twelve feet distant. The boiler rested on cast iron plates on the floor, 13" high and enclosed a combustion chamber connected by pipe with the chimney. In the front of the boiler casing were two hinged clean-out doors and beneath them a hinged door to the combustion chamber. The electrical equipment which controlled the motor included a fuse-connection or fire-valve located in front of the boiler about a foot above the floor such that the fuse would melt if exposed to a temperature of 168° F. and thereby stop the motor.

8. On January 21, 1941, and long prior thereto, the defendant, The Kasden Company, was under contract with H. G. Benowitz, Inc., to supply the necessary oil for the building. The arrangement between the parties was such that The Kasden Company assumed the responsibility of keeping the building sufficiently supplied with No. 4 fuel oil. On January 21, 1941, in the late afternoon Kasden's driver measured the tank as was his custom by unscrewing the fitting in the top and inserting the measuring stick left in the premises for the purpose. He then replaced the fitting. The stick showed the depth of the fuel oil in the tank in inches. This measurement the driver, by reference to a chart which he carried for the purpose, translated into gallons. This process indicated a content on that occasion of 180 gallons. Early in the same evening the driver returned and through the metered device on his truck put 300 gallons into the tank through its feed-pipe, the orifice of which was just under the manhole in the sidewalk.

9. On March 11, 1940, a driver of Kasden's when filling the tank in said building caused a substantial spillage of oil in the vicinity of the tank.

10. On January 21, 1941, about one hour after the tank had been filled as aforesaid, a fire was discovered in said basement. The fire was in the basement ceiling (floor joists of the ground floor) above the boiler.

11. The evidence does not warrant a finding that on January 21, 1941, Kasden's driver caused any substantial spillage of fuel oil in the premises, or that there was free oil on the floor which was a contributing cause of the fire.

12. The evidence does not warrant a finding that prior to the fire the Benowitz defendants had notice or knowledge of a defect in any part of the heating equipment which was the cause of the fire.

13. The evidence does not warrant a finding that the heating equipment as maintained prior to the fire was in such condition that it might reasonably have been expected to cause a fire.

### Conclusions of Law.

1. In the absence of notice or knowledge that the heating equipment as maintained prior to the fire was not safe for operation, the defendants were not guilty of negligence.

2. The defendants were not guilty of negligence which was a proximate cause of the fire.

3. The defendants were not guilty of maintaining a nuisance.

### The Evidence Discussed as to the Defendant The Kasden Company.

Kasden's driver who filled the tank on the evening of the fire is emphatic in his assertion that he caused no spillage of oil on that occasion. The arrangement of the equipment was such that he would almost certainly have known of it if any serious spillage had then occurred. I find no substantial inconsistencies in his testimony. It is undisputed that he last filled the tank early on January 18th. Assuming that the tank then was left completely filled, it is entirely consistent with the underlying data that after three and a half days of winter weather the contents might have been reduced to 180 gallons. And there is contemporary documentary evidence, Exhibits A and D, supporting his testimony that only 300 gallons was delivered on January 21st. Altogether I see no reason whatever for rejecting his testimony merely because it might have been colored by reason of his employment.

On the other hand, the plaintiff's evidence of spillage is far from convincing. True, on March 11, 1940, there was evidence that spillage had occurred in connection with the filling of the tank. But this piece of evidence, even if admissible on the issue of Kasden's negligence—which may be doubted—is of very slight weight, especially so since not connected with the driver who made the delivery on the night of the fire.

There is no direct evidence of spillage. Such evidence as there is consists principally of testimony of several officials of the Shelton Fire Department as to the evidence of free oil in the premises after their arrival on the occasion of the fire. One testified to an oil smudge on the end of the tank (as appears in Exhibit 7); another testified to moisture, apparently oil, on the floor. But for aught that appears the oil smudge on the tank may have been caused by drippings from the measuring stick which during the cold weather was used every three days or so to measure the contents of the tank. And the stains on the floor and the moisture seen there may have been a combination from the copious water used to extinguish the fire, the oil saturated grime left on the floor when the tank long before had overflowed, together with the soot and carbon from the charred joists in the cellar ceiling.

Moreover, all the evidence unites to indicate that practically all the conflagration was in the ceiling. Indeed, the burner was equipped with a fuse connection so designed that the fuse would melt and break the electrical connection in the event of intense heat in the vicinity. The fact that this connection near the floor was not melted tends to negative any possible inference that the fire was caused by an accumulation of oil on the floor. If the fire were caused by such oil or vapor therefrom coming in contact with the combustion chamber or with flame from within, one would have expected the free oil on the floor to have ignited which would almost certainly have melted the fuse connection with the motor.

The fire officials at the time of the fire sought to test the moisture on the floor by a blotter, it being their thought that when the blotter dried out its condition would

disclose whether oil had been a constituent of the moisture. But curiously enough, so far as the evidence shows, there was no further examination of the moistened blotter and no testimony of the indications resulting from the test.

 The burden of proof is on the plaintiff, and the plaintiff I think has failed to prove either that there was an overflow of the tank for which Kasden would be liable, or that the overflow, if any, was a contributing cause of the fire.

### As to the Benowitz Defendants.

Having already discussed the basis of my finding that the plaintiff has failed to prove an overflow from the oil tank which contributed to the fire, I turn now to consider the sufficiency of plaintiff's proofs that the Benowitz defendants are liable because of the existence of some defect in the heating apparatus which they should have corrected.

Commissioner Merwin testified to some defect existing in October, 1939. But that was before the defendants had installed the new Williams burner. A defect in a burner which was removed in December, 1939, certainly is not material on the issue of negligence or nuisance with respect to the burner thereafter installed. The Commissioner testified that he was in the premises on March 11, 1940, but so far as his testimony shows the only occasion of his presence then was the overflow of the tank: he gave no testimony as to the presence of defective equipment on that occasion. He testified also that he had been there on other occasions on account of trouble with the oil burner but he was entirely unable to say that these occasions were after the new burner had been installed in December, 1939.

Assistant Fire Chief Purcell gave considerable testimony as to visits which he made to the premises on account of trouble with the burner. First he said that after March 11, 1940, when the tank had overflowed he went in to shut the burner off but didn't "know just what the date was, because the Fire Chief didn't put it down, because it didn't amount to anything." Later when recalled and pressed by plaintiff's counsel to state how often he had been called to the premises on account of trouble before the fire in question, he said he had been there on seven such occasions "within a year." But he later testified that *after*

*these visits* "they changed the burner there one time and put another one in." This suggests strongly that the period when all these unrecorded visits were made may have been a year earlier than was stated in his first testimony. It is not surprising that a witness testifying wholly from memory in 1943 should be in some uncertainty as to whether such visits occurred in 1939 when the old burner was in use or in 1940 after the new Williams burner had been installed.

Police Chief Donovan also testified. But his testimony was based almost wholly on hearsay complaints. He gave no testimony based on personal observation of defects occurring after the new burner had been installed.

 In short, I find no competent testimony from these witnesses which sufficiently supports the plaintiff's contention of prior trouble with the Williams burner. Nor is that contention supported by the documentary evidence consisting of the reports of the Fire Marshal to the State Police made as required by G.S. 1930, Sec. 2308. These reports attest a blow-out in the old burner on October 31, 1939, the overflowed tank on March 11, 1940—and nothing else prior to January 21, 1941. And certainly the opinion stated in the official report of the fire that it was due to an overflowed tank is not binding on the court, especially when the witnesses who were the sources of the official report have been examined before the court.

More significant is Purcell's testimony that he was the first to enter the premises on the occasion of the fire on January 21, 1941, and then found the door on the boiler open and the motor running. This fact, if true, might support an inference that there had been some explosion in the fire chamber due to some defect in the equipment. But even so, that fact standing alone, or indeed considered together with all the other evidence, is insufficient to prove the defendants guilty of negligence contributing to the fire or guilty of maintaining a nuisance.

There was further testimony that for a long time prior to the fire there had been a crack between the iron base plates which support the boiler on the floor. But this testimony is significant only in connection with proof that the floor was flooded with oil which may have worked through this crack and thus caused the fire. As stated

572

above, the free oil on the floor has not been proved. Nor, I think, is there convincing proof that this fire could have been caused in that way. As observed above, if the fire had been caused by vapor rising from oil on the floor coming into contact with flame or heat in the equipment just above, one would have expected the oil to ignite and melt the fuse-connection which was only a foot above the floor. This hypothesis is disposed of by the absence of evidence of fire near the floor level, and the sooty quality of the smoke can as reasonably be attributed to the character of the floor joists burning above the boiler in a confined basement, as to free oil on the floor.

A great deal of testimony relates to the lack of a gauge on the oil tank. Granted, as plaintiff contends, that it is hazardous practice to maintain a tank without such a gauge, there is still no proof that the absence of the gauge here was a contributing cause of the fire. For the witness whom plaintiff offered as an expert explained that the inherent hazard was due to the danger that when the tank was to be filled, for lack of a gauge the fitting would be removed to permit the insertion of a measuring stick and might not be replaced. This would leave a vent in the top of the tank of dangerous dimensions. But the same witness really conceded that if, after measuring, the fitting had been replaced, as was the evidence here, the existence of the small $\frac{1}{4}''$ aperture in the fitting was not a source of danger. When the tank was filled, any excess vapor in the tank had a free course of exit through the vent pipe. Certainly in the light of such evidence it would be far fetched to infer that vapor escaping through the $\frac{1}{4}''$ aperture in the fitting for the absent gauge had been the cause of a fire which later broke out across the room over the boiler. And the absence of evidence to show that the escape of oil through that aperture has already received discussion.

Modern life is intimately associated with a variety of household gadgets. Somewhat as a dog is generally allowed a "first bite", such a gadget may be allowed to mis-perform at least once before its owner is held liable for the consequences. And in substance nothing further has been proved here.

The Clerk will accordingly enter a judgment for all defendants, with costs.